versus Kalonymus Development Partners, I may be mispronouncing that, case number 23-13678. Good morning, Your Honors. Morning. Can you just give me one second while counsel gets that up? Thanks so much. Okay. All right. Whenever you're ready, counsel. Good morning, Your Honors. May it please the Court. Jesus Cruz on behalf of appellants Mr. Marmol and Mr. Lembour. There are a few teachings that are critical in this case. One comes from M&M. M&M made clear that it is fatal for a party not to establish a prima facie case when that party is moving for specific performance and damages. M&M case is directly on point. In this particular case, Kalonymus did not establish a prima facie case for specific performance or damages. In addition to that, there are the teachings from the Farman case. In the Farman case, the fourth DCA repeated what we all know, which is that the three essential elements of a breach of contract case are having a contract, breaching the contract, and the third essential element is to prove damages. In this particular case, like in Farman, there was no sufficient evidence to prove damages. At bottom, like in Farman, Kalonymus in this case did not suffer, to borrow a word from Farman, did not spend a single dime or did not suffer a single dime in damages. Let's get to the specific performance. What element do you want to focus on from M&M that you think was not met here? Your Honor, there are two, right? Obviously, in order to prove a prima facie case, the movement has to prove that the movement is ready, willing, and able. What's the timeframe that we're looking at for that? Your Honor, it's all the way through closing and after the lawsuit is filed as well. Closing? I'm sorry. Yeah. Well, that's the part I want to focus on for one second. Sorry to jump in, Judge Legolas. So if you look at M&M, M&M in its discussion of what the law you're talking about refers to two cases, one of which is – I'm going to get this wrong – and it deals there with, in discussing the ready, willing, and able prong, the timeframe issue because this seems to be very relevant to our discussion. And here's what it says. To prove that a prospective purchaser of property is ready, willing, and able to buy, the purchaser must show that he is able to command the necessary money to close the deal on reasonable notice or within the time stipulated by the parties, period. And here, the time stipulated parties, especially in a time is of the essence case, was closing. I don't see anything in Florida law that I've looked at that says that that ready, willing, and able requirement extends beyond the time of closing until months later when you file your lawsuit or even after the lawsuit is filed, as you've claimed in this case, in January of 2002 and February of 2002. What am I missing there, counsel? Your Honor, the – I can't cite to a specific case at this particular point in time on that issue because that issue was never raised. Not that it's extremely important. I think it is – I mean, the case law that we're all talking about refers to it, and this issue of when the ready, willing, and able is very much at issue here. And, Your Honor, in this particular case, in this particular case, it really doesn't make a difference because Colonymous was never ready. So why don't you talk about that? Let's assume that the issue is closing date. What was the closing date? Your Honor, the initial closing date was October of 2021. So were they ready, willing, and able to close in October? No, the evidence is uncontested that the party that was going to purchase the membership interest were two separate entities. It was 367-Puenciana and Puenciana LLC. The evidence is clear that when – if you're focused on financial ability, right, the party that was going to pay for the funds – Did you have to have binding commitments, binding financial commitments to show? You need three things, Your Honor. You need to show that you have the cash at hand, right? Number two is you need to show that you have the assets and the credit sufficient to show that you can reasonably command the purchase price. And number three, to your point, if you don't have one or two, then you need to show that you have a binding commitment from a financially able party. Didn't they have that from a bank? No, Your Honor. The 367-Puenciana had it from the bank. So I've bought a couple houses before, unfortunately. And when you buy a house, the way it works is you get financing because you don't have the cash generally to purchase the full purchase price to pay off the seller. And so you go to the bank and you say, bank, will you give me a loan? The bank says, sure. We looked at your credit score. You have some money in this bank. You're not a horrible human being. And you'll give me collateral based on the property. And I sign off and say, sure. And then you go to closing. And what happens is you go to closing, you sign the paperwork, and the bank transfers the money to the seller. The money never hits my account, right? I understand that. Am I right what I just said? You're absolutely right, Your Honor. What does it matter here if the financial transaction is bank to third-party LLC to seller than if it went from bank to seller? How does that matter for purposes of the binding commitment prong that we're talking about? Your Honor, I understand what Your Honor is saying. I'm focused on the law. I know, and I'm focused on the law, too. It says binding commitment. It doesn't say that it has to be a binding commitment to there because in any financial transaction, if you look at Mazzoni, for example, where all this comes from, the money never hits the buyer's account. The money goes from bank or lender, whoever that is, to seller because lender doesn't want to put it in my account because they know that the money is at risk if they put it in my account. They wire it directly so that there's no problem. I guess I don't see what the issue is if it happens to go like a little more securitous until it gets to the seller than if it just goes directly. Your Honor, in both the M&M case and in the Kaposi case from the fourth DCA, it was clear that the party that has to have the binding commitment from a financially able entity is the party that is moving for a specific performance. This, Your Honor, we understand that it's a matter of black-letter law. I'm sorry, but what if let's say I'm purchasing this property, but I don't want to purchase the property. You don't need to know. I'm doing the deal, but at the end of the day, I'm going to rent this property. I want to do something else, so I form a corporate entity, and the financial commitment letter, the binding commitment is through this financial entity that I've created, and I've told the bank, and so the bank is giving the financial commitment letter to this entity. What does it matter, then, that that's how I'm going to do the transaction? Your Honor, it seems that what you're alluding to are facts similar to an M&M. In M&M, the bank issued a letter saying that Marino and Morris had sufficient credit with the bank to close, and that case, like this one, had to do with $5 million. In M&M, the court was focused on the party that is specifically demanding specific performance. I thought that there was testimony from, is his name Zef? I think so. Yes, Your Honor. That the large majority of the cash was going to come from another entity, that that was the testimony that was provided at trial. Yes, Your Honor, and by the way, that's another point, because when you're I know there was, it's half, right? It was only half. When you're dealing with the banks, right, that's the coming from the bank, that's the loan, right? Then there's this separate testimony that talks about the 50% cash. When they're talking about the 50% cash, Your Honor, there's no evidence in the record, right, who this other entity is, right? They didn't come forward with sufficient evidence to prove that, in fact, Colonymous had the funds, commanded the funds. That is accurate, that there is nothing in the record to show who the entity was, that there was no, that that was not provided at trial. That is correct. The testimony was, Your Honor, that that entity was going to provide. Can I ask you a quick question? Do we look, so as I understand it, the specific performance part that we're talking about now was granted on summary judgment, and the trial was just on the damages piece, right? That's correct, Your Honor. Can we look at the trial record to determine what happened at summary judgment? Your Honor, I believe that you do, right, because at the motion for summary judgment stage, the movement has the burden. It's the movement that has the burden of establishing two things. There's no genuine issue of fact, and then number two is that the movement is entitled to judgment as a matter of law. With this record, right, the uncontested and undisputed evidence show that the movement is not entitled to judgment as a matter of law. Thank you, Counsel. Can I ask a question? No, of course. I just want to confirm, the property has closed at this point? Yes, Your Honor, the property has closed. The Colonymous did not purchase the property. The separate entities, the Poinciana entities, are the ones that purchased the property. Okay, that's fine, but the property now has been sold. It's closed. It has been. It no longer belongs to your client. No, Your Honor, obviously it's subject to the appeal. Thank you. Good morning. May it please the Court, Bridget Chexamole for the appellee. The District Court correctly entered judgment in the appellee's favor. As the appellee was entitled to specific performance and damages resulting from the property purchase. Can I ask you a question? How exactly did you meet the element that your client was ready, willing, and able to perform on the contract? Assume the closing is in October. Yes, Your Honor. I'll start with the ready prong, because that's what the court was focused on with the appellant. I can go back to the willing part also. I'm sorry, able, able, and then go back to. So, M&M does require that you show one of three ways. And here, the record evidence before the court was the following. On summary judgment, Max Zeff did provide the court with a declaration that's in the record at 7711. And in that declaration, he stated that he had obtained loan commitments from lenders on favorable terms in order to effectuate the purchase. So, at summary judgment. Then, if you look at the loan portfolio, which is from Newmark and is also in the record at 159-3, that lists the property, the best peacock in property, and it also lists Max Zeff as one of the key principals. And what's interesting about that and what's telling, and is also part of the record, is that that loan portfolio was not just for this piece of property. It was for four pieces of property, the other three of which closed, including one of those three was a sale from the same appellants, sellers, to my client, the buyer. So, we know that my client was able to close. Judge Legault's question, though, to your opposing counsel was focused on, so, and I'm asking. I don't know the answer to this. So, as I understand it, the financing had two pieces. There was a, we'll call it a debt piece and an equity piece. The debt piece came from the bank and it went through the, as I understand it, to the third-party LLCs that were created, then to the seller. But the equity piece, I think, was going to be some cash from Mr. Zeff himself and then from the rest of it, the majority of it, the vast majority of it, from investors or from some other investors. What evidence was there of a binding commitment regarding those investors? The district court in 168-2 at pages 55 and 58 stated that, or found that Max Zeff's testimony was unrefuted, that he had the cash. So, we're talking about trial. So, this is the summary. I have to say, this is a frustration I've had with this case in the briefing, and some of it's not your fault because you're trying to describe procedural history with all this stuff going on. But am I wrong to say that the specific performance piece was part of summary judgment? Your Honor, yes. In the summary judgment, the court found that there was an agreement. But there was no evidence. There was no record evidence other than the declaration, the affidavit. Your Honor, there was the declaration, there was a number of other documents, but the district court found that to be unrefuted. They did not challenge that the loan that the client had, that the declaration stated there was a loan commitment. Also in the declaration. But normally, I mean, normally an affidavit would have been filed saying, I have a loan commitment, and it would attach a letter from the bank saying, here's my loan commitment letter, or it would attach something from the business, the custodian of record for the bank saying, here is the letter that we provided to ABC Corporation showing this financial commitment. I mean, I could say, I could do a declaration saying that the sky is green. I mean, there has to be something more than that. And they were always challenging that you were not ready, willing, and able to close. Your Honor, the district court, in its order, stated that that argument came out later at trial, and I believe the court actually referred to it as a gotcha argument, that it wasn't that. They weren't challenging ready, willing, and able. And in fact, they don't mention the M&M case until the second day of trial, 68-2. That said, the declaration from my client, which was unrefuted, does state that he had obtained loan commitments from lenders on favorable terms to effectuate the purchase. The district court found that to be sufficient to support the specific performance finding as to that there were some damages. Just going back to Lux's question. Judge Lux's question, and maybe part of that, can you answer, what was the basis, and maybe this is just reminding me, at least two requests for reductions, right? So when Marmo says, okay, we're ready, then let's reduce it by $750,000. Then another time, we're ready, let's reduce it by $1.5 million. How does that relate, those requests relate to damages question? Just for purposes of the timeline, Your Honor, that does happen after the October, after the breach and after the closing does not happen in October. So my client is attempting to negotiate to get the appellants back to the table so that we can close on this property. At the same time, though, just putting it in perspective from a factual standpoint, they weren't as responsive. They were not living in the U.S. When we did file the complaint, they did not accept service, even though we were communicating with their real estate lawyer. So our client was trying to get them back to the table. He was doing what I believe he said was rough calculations or, you know, where he was going through the difference in the credit rates, the difference in, you know, the due diligence, everything that he would have to do and was coming up with these numbers. By February of 2022, in a response letter to counsel for appellant, we do lay out all of the amounts. So throughout the negotiations, and the district court found that to be, you know, the case. You're trying to get them to the table. You're putting out numbers, and those numbers may be supported, but they may not be. Yes, one of my concerns that I have is that the binding financial commitment, okay, even though I don't have anything more than your client's testimony, Mr. Zeff's testimony in his affidavit, is the financial commitment was to this other entity that was not Calimus. Right. 3667. Yes, Your Honor. The burden, I think, under Capozzi is on your client, Calimus, to show that it had a binding commitment from financially able lenders, and I think you had to then show some kind of privity then to that other entity who had the commitment because the commitment was not to Calimus. So, first, Your Honor, at the bottom of the new Marklund portfolio, it does reference the Calimus credit facility. It also lists Max Zeff, who is the principal of Calimus, as a key principal for this loan portfolio. At the top of the new Marklund loan portfolio, it actually lists the properties, and I understand what Your Honor is saying. It doesn't list Calimus, but it does list Best Peacock Inn, which is the LLC, which is the property at issue. So the loan was for the purpose of, or part of the loan, because it was a $13 million loan, but part of it was to effectuate the sale of that property. The fact that our client was going to set up, if and when the property closed, an entity solely for the property, we don't believe changes that result. Based on what we know happens and the fact that Max Zeff was able to command the money, which is, as you stated earlier, under the law, it's not bringing the cash in hand anymore. We don't do that. That's just not how property closings work. It's being able to command the money. We know he was able to command the money under this loan because he did so for the three other properties that closed under the loan portfolio or the revised loan portfolio. Was that part of the summary judgment record? The summary judgment. About the other properties? Let me just look, Your Honor, at the record site that I have, because it is definitely in the record. It seems to me, respectfully, that at this point, this seems like a very factual dispute that should be going to a jury. Your Honor, if you look at what we're disputing, though, we're not disputing for specific performance. There's three elements. There's no dispute that there was an agreement. There's no dispute that the agreement was breached. And the district court found in the summary judgment that appellants conceded that there were some damages. But there is an issue as to breach because if there is an issue as to whether or not your client was ready, willing, and able to close, not able to do that, then there is no breach. Your Honor, at summary judgment, the issue of ready, willing, and able was not raised. The district court found the first time it was raised was at trial. Isn't it your burden, though, at least to initially show? In other words, if that's an element, and I think it is a part of the element, I think your opposing counsel is right on that. At summary judgment, as I understand it, you have to come forward with some evidence, and then the question is whether it's rebutted for elements that you must prove, right? Yes, Your Honor. As the move-in, we do have that burden, and we believe that we met that burden. The district court agreed with us based on the loan commitment and the declaration of Max F in the record. Do you agree that we cannot look at the trial record to decide that issue? Your Honor, again, and I understand the court's frustration. Well, I'm speaking for myself. I apologize, then, Your Honor's frustration, because you're right, there is intermingling. Because this doesn't come up, this issue is not flushed out until the second day of trial when the case is raised. And so it does bleed into the trial, but looking solely at the case, but it bleeds into the trial because at summary judgment, that was your burden, and you should have met it then, then and there. I agree, Your Honor, that it's our burden. Because then we wouldn't be here. As the move-in, it is our burden, that is correct, and we believe that we did meet that based on the declaration and the evidence that was put forward, which included emails as part of our exhibits to summary judgment where there was discussion that we were planning. Can I ask you part of the damages?  I don't want to short-circuit any other discussion, but I did have a question on the damages trial. Yes, Your Honor. As I understand the evidence regarding tax advantages, which was one of the line items for which your client was awarded damages, the expert testimony that was presented was, quote, that the tax advantage, quote, flows all the way up to the individuals that are filing the tax returns. There's a dot, dot, dot in there somewhere. And that's at docket entry 168. I think the trial record is that. That's the trial. It's at 186 of the trial. And that really is the only evidence, as I understand, regarding the tax advantages, about really the only evidence that it's there and that supports it. Maybe I'm missing something in the record, so please point me to it. So, Your Honor, Your Honor is correct that the discussion of the sunsetting tax advantages was discussed by our expert at the trial. They did not present another, an expert. And so the trial court found that our expert's testimony was unrebutted. Sorry, go ahead. I apologize, Your Honor. No, go ahead. Looking at the trial of the district court's order, it does go through. I'm not worried about the trial court's order at the moment. I'm just talking about the record. And so let's assume for the moment that what I read is the basis for what the district court ultimately awarded. That testimony seems to suggest that the corporation bears no benefit of those tax returns. It's a flow through. By the way, that isn't surprising. It's an LLC. The whole point of an LLC is it's a flow through to the individuals. The corporation doesn't have any tax consequences. They all flow through to the individual. So how then can the corporation, as opposed to the individual, claim tax benefits that your own expert testified flow through to the individual? Your Honor, I'd have to pull out the actual transcript, which I have. I have that he explained that what he meant was that they were subject to less favorable tax treatment because the deal did not close and because of the sunsetting. There's no doubt about it. I don't doubt that for a second, but I'm talking about who benefited from that tax benefit. Your Honor, I can grab the transcript. We can all look at it. That's just the question I had regarding that. The court found that because his testimony was unrebutted, the court was comfortable with the $14,000. The court believed that the $14,000. I know, but if the benefit went to the individuals or was to flow through the individuals and all we have before us is the corporate entity, that's the issue. And that's the issue your opposing counsel has raised, which is all of this. It was very little evidence showed that the actual entity, Calamus, was the one benefiting from any of this stuff. It was other folks that were going to benefit. I would take issue with the fact that the expert was quite clear that Calamus was the party that overall, as to all of the damages, was. That's why I'm only asking you about $14,000. I apologize, your Honor. I just wanted to be very clear that the expert's testimony was unrebutted and there was a good number of pages where that was discussed in the record. As for the tax depreciation, the expert's testimony was that it was sunsetting, that the court did go through that and did find that testimony to be valid and took it into consideration. And obviously, I just want to confirm, obviously our review is de novo of the summary judgment. Yes, your Honor. Yes, it is. If the court has no other questions, I'd ask the court to refer to your respects. Thank you, your Honors. Respectfully, your Honor. Not only did Calamus not prove or not establish that it was ready, willing, and able, but in addition to that, now I'm focused on Farman. Like in Farman, in this particular case, damages were not established. Well, can we get back to the questions that Judge Lagoa was asking of your opposing counsel? Tell me why that affidavit from Mr. Zeff, who is the principal of Calamus here, is not sufficient for summary judgment purposes on the ready, willing, and able problem? Because it was unrebutted. That would have to be insufficient in and of itself. So why is it? Your Honor, I don't recall the specific substance of the affidavit, but I will say this. There's no question that the record is uncontested, both at the summary judgment level and at the trial level, that the purchaser was not going to be Calamus, and that the party that was taking the loan was not going to be Calamus. The court has the lock-rate agreement of October 12, 2021. In that agreement, Calamus is not a party. The party taking the loan— I thought the record showed that Calamus is the buyer, but that the intention was that there would be essentially a simultaneous assignment. Your Honor, they formed 367— Right, to be the holding entities. But it's actually to assign the purchase agreement. The one that was going to close under the closing documents, it's not Calamus. Calamus does not appear as the purchaser of the entities in the closing documents that were prepared. But the contract that's at issue here is between Calamus and your clients, is it not? Absolutely, Your Honor. And the plaintiff that's suing is Calamus. The plaintiff, Calamus, and Calamus alone has to prove that it, and not a third party— I think everyone agrees that it has to meet its burden. But my question is, as I understand it, Mr. Zeff in his affidavit said that, I swear that we had financial commitments in order to meet the requirements to be able to purchase and close on X and X date. Your Honor, the record respectfully, and I am referring to not only the record on the summary judgment, the record— Let's focus. Do me a favor. Please just focus on summary judgment at the moment. Your Honor, the uncontested evidence shows that Calamus was not going to be the borrower, right? And there's no evidence in the record, none whatsoever, at the motion for summary judgment level, that Calamus had the funds to pay the difference, the down payment if we're talking about the purchase of a house. Your Honor, there's absolutely no record evidence, nowhere, that Calamus itself had the funds to purchase the property. So you're saying Zeff's affidavit still doesn't satisfy that particular element or burden for Calamus? Your Honor, I don't remember the specific affidavit, but I do know that record. Okay. And I can absolutely assure the court, right, that there's nothing in the record that satisfies, right, cash in hand, right, the assets and credit rating. It would have to be the third prong. And the third prong. Your Honor, you're not going to find anything in the record. I assure you this. It's uncontested. That shows that Calamus itself, a corporate entity, had a binding commitment from a financially able party. It doesn't exist. If you're focused on the loan, let's assume, right, that the lender is a financially able party. Those loan documents were not with Calamus. Those loan documents were with another party. I guess that gets back to my original question I had with you, is why does that matter? In other words, if there was financing to buy this, and that was in the record. I'm not saying it is, but let's assume that there was record evidence of a contract by a bank which says I am going to loan this money on behalf of the purchase of this, and it's going to go into the seller's account on the date of the closing. What does it matter who signed that document, who brought that document, who guaranteed it? If it's a binding commitment, it's a binding commitment. Your Honor, what comes to mind is the law. Look at what happened. Show me where that privity element is in any of the cases. As I read the cases, and we've gone through them, no one says the financial commitment must be from the buyer and no one else. Right? It doesn't say that. Your Honor, the buyer needs to have the financial commitment, right, from a third-party lender. Right, from a financial. It has to have the binding commitment from a financially able. It's the buyer, the one that has to have it. Well, can I ask you a question? And this is sort of, I guess, a hypothetical. Could colonialismists have entered into an assignment and assigned its rights under the contract to another entity? And if that entity then had the financial commitment at the time of closing, would it be satisfied, the ready, willing, and able to close? Your Honor, the answer is yes, but then it would have been that entity, the one that had standing to sue. Right. I see. So your argument really, so it's a little two-fold. It's colonialismists did not have, was not ready, willing, and able to close because they didn't have the financial commitment. But two, you're also suggesting that to the degree that the other entity was the one that was ready, willing, and able to close, they're the ones that should be in this litigation? Your Honor, there's no evidence of any entity being ready, willing, and able to close. The only record evidence that you have of a financial commitment to a party is Newmark to 367 Poinciana for 50% of the purchase price. The rest, the cash, there's no evidence in the record who was going to provide the cash. In fact, at trial, Seth specifically mentioned that the cash was going to come. But that was at trial. That was not at the summary judgment. So at the summary judgment stage, there was no evidence as to where the cash, the other half, was going to come from. Your Honor, at the summary judgment stage, they didn't even try to argue that they were ready, willing, and able. And under Rule 56, it was their burden. Thank you, Counsel. Thank you. Thank you, Your Honor. All right, Counsel, based on some of the questioning that came up, there's certainly a question in my mind about whether the specific performance issue is a moot issue given that it's closed. What relief can we give if a property is closed? Now, Counsel for the sellers here indicated that there's a clause there that may unwind it if this litigation comes out, and that may save it from mootness. But I'd like for the parties to give a supplemental brief to us, no more than ten pages double-spaced, on whether the specific performance issue is moot. Is two weeks sufficient amount of time for the parties? Is 14 days okay? Counsel? Thank you. Okay. I appreciate it. Thank you. We're adjourned for the week. Thank you so much.